IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DANNY HAROLD ROLLING,

      Petitioner,

v.                                              Case No.  1:02-cv-98/MCR

JAMES V. CROSBY, JR., Secretary,
Florida Department of Corrections, and
CHARLIE CRIST, Attorney General of Florida,

      Respondents.

_____/

## O R D E R

    This cause is before the Court on  a petition for writ of habeas corpus filed by Danny Harold Rolling ("Rolling"), a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 1).  In his petition Rolling has asserted four claims for relief.  The state has filed a response (doc. 7).  After careful consideration of the issues raised in the pleadings and for the reasons stated below, the petition is denied.

## I.  BACKGROUND

    On November 15, 1991, Rolling was indicted by an Alachua County, Florida grand jury on five counts of first-degree murder, three counts of sexual battery, and three counts of armed burglary of a dwelling with battery.  (Doc. 1, ¶ 4).  The charges arose from the August 1990 homicides of five college students in three different residences over the course of three days in Gainesville, Florida.[1]  Originally, Rolling entered pleas of not guilty on all counts.  On February 15, 1994, the day his jury trial was scheduled to begin, Rolling changed his plea from not guilty to guilty on all

_____

[1]  The facts surrounding the murders are set out fully in the decision of the Supreme Court of Florida on direct review.  See Rolling v. State, 695 So.2d 278, 281-82 (Fla. 1997) ("Rolling I"), cert. denied, 522 U.S. 984, 118 S. Ct. 448 (Mem.), 139 L. Ed. 2d 383 (1997).

counts, and the trial court accepted his pleas and adjudicated him guilty on all counts.

Jury selection for the penalty phase began on the following day, and testimony took place between March 7 and March 24, 1994.  The jury returned with an unanimous advisory recommendation of death for each of the five homicides. On March 29, 1994, the parties presented additional evidence and argument to the trial court, and on April 20, 1994, the trial court held the final sentencing hearing in Rolling's case.  The trial court imposed a sentence of death for each of the five homicides citing four aggravating circumstances that were applicable to each homicide: (1) prior conviction of a violent felony; (2) each murder was committed in a cold, calculated, and premeditated manner; (3) each murder was heinous, atrocious, or cruel; and (4) each murder was committed during a burglary or sexual battery.  Rolling v. State, 695 So. 2d 278, 283 (Fla. 1997) ("Rolling I"), cert. denied, 522 U.S. 984, 118 S. Ct. 448 (Mem.), 139 L. Ed. 2d 383 (1997). The trial court found as statutory mitigating factors that (1) Rolling had the emotional age of a fifteen year old and (2) that he committed the crimes while under the influence of extreme mental or emotional disturbance.  Id.  In addition, the trial court found the following non-statutory mitigating factors: (1) Rolling came from a dysfunctional family and suffered physical and mental abuse during childhood, which contributed to his mental condition at the time of the offenses; (2) Rolling confessed and entered pleas, thereby saving the criminal justice system time and expense; (3) Rolling felt remorse for his actions; (4) Rolling's family has a history of mental illness; and (5) Rolling's ability to conform his conduct to the requirements of the law was impaired because of mental illness.  Id.

Rolling appealed his sentences to the Supreme Court of Florida raising six points of error.[2]  On March 20, 1997, the Supreme Court of Florida affirmed Rolling's

---

[2]   Rolling claimed that the trial court:  (1) abused its discretion in denying his motion for a change of venue, which violated his Sixth Amendment right to trial by an impartial jury; (2) erred in denying his motion to suppress statements which were obtained in violation of his Sixth Amendment right to counsel; (3) erred in denying his motion to sever and conduct three separate sentencing proceedings; (4) erred in denying his motion to suppress physical evidence seized without a warrant in violation of his Fourth Amendment rights; (5) erred in finding that the homicide of Sonya Larson was especially heinous, atrocious, or cruel; and (6) erred by giving an invalid and unconstitutional jury instruction on the heinous, atrocious, or cruel aggravating circumstance.  See Rolling I, 695 So.2d at 283.

sentences of death, and the United States Supreme Court subsequently denied Rolling's petition for a writ of certiorari.  See Rolling v. Florida, 522 U.S. 984, 118 S. Ct. 448 (Mem.), 139 L. Ed. 2d 383 (1997).

Rolling filed a motion for post-conviction relief in state court pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure and subsequently filed an amended motion which asserted two grounds for relief.[3]  An evidentiary hearing was held regarding Rolling's post-conviction claims, and on March 5, 2001, the circuit court denied all of Rolling's claims.  The Supreme Court of Florida affirmed the circuit court's denial of post-conviction relief on appeal.  See Rolling v. State, 825 So. 2d 293 (Fla. 2002) ("Rolling II").  This petition followed.

## II.  STANDARD OF REVIEW

Section 2254(a) of Title 28, United States Code,  provides that ". . . a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Because Rolling's petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under Section 2254 as modified by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.  In relevant part, Section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3]   In his original Rule 3.850 motion, Rolling asserted twenty-nine claims which were raised in a summary fashion and dropped in the amended motion.  The two grounds raised in the amended Rule 3.850 motion were: (1) trial counsel were ineffective for failing to timely seek and procure a change of venue; and (2) trial counsel were ineffective for failing to challenge particular jurors during voir dire.  See Rolling v. State, ("Rolling II"), 825 So. 2d 293, 295 n. 1 (Fla. 2002).

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the post-AEDPA framework for Section 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate requirements were described by Justice O'Connor in her concurrence as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. 529 U. S. at 412-13, 120 S. Ct. at 1523 (O'Connor, J., concurring).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); see Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003); Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001), cert. denied, 535 U.S. 1104, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002) (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); see also Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations).  Although Williams set forth the Supreme Court's interpretation of

§ 2254(d)(1), not § 2254(d)(2), the Court subsequently enunciated the § 2254(d)(2) standard:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2); see also Williams, 529 U.S. at 399, 120 S.Ct. 1495 (opinion of O'CONNOR, J.).

Miller-El, supra, 537 U.S. 322, 123 S.Ct. at 1041 (dicta).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding.  *See* Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343-45 (11th Cir. 2002); Fugate, supra.  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, supra, 314 F.3d at 1260; Robinson, supra, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, supra, 314 F.3d at 1260, Robinson, supra, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  Wellington, supra, 314 F.3d at 1260 (quoting Fugate, supra, 261 F.3d at 1216 (quoting Williams, supra, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, supra, 314 F.3d at 1260 (citing and quoting Williams, supra, 529 U.S. at 404-05).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does

not fit within the "contrary to" clause, and the federal habeas court must go to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." <u>Fugate</u>, <u>supra</u>, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and petitioner's case are <u>not</u> substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." <u>Id</u>. (citing and quoting <u>Williams</u>, <u>supra</u>, 529 U.S. at 406).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, <u>supra</u>, 529 U.S. at 409, 120 S. Ct. at 1521.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Bell v. Cone</u>, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (quoting <u>Williams</u>, <u>supra</u>, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that that [the state court] judgment is infected by constitutional error." <u>Williams</u>, <u>supra</u>, 529 U.S. at 389, 120 S. Ct. at 1511. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S.Ct. 2140, 2149 (2004).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent.  <u>Van Poyck v. Fla. Dep't of Corrections</u>, 290 F.3d 1318, 1322 n. 4 (11th Cir. 2002).

Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in <u>Brecht v. Abrahamson</u>, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" <u>Id</u>. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[4]

Within this framework, the Court will review Rolling's claims.

### III. PETITIONER'S CLAIMS

A.   **Ground One:   Venue**

Rolling's venue claim has two subparts, which will be addressed accordingly.

1.   <u>Denial of a Fair Trial by Impartial Jurors–Failure of the Trial Court to Grant a Venue Change</u>

In the first part of his venue claim, Rolling alleges that the trial court's failure to grant his motion for a change of venue denied him a fair trial by a panel of impartial, indifferent jurors in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.  Rolling contends that the media coverage of the student homicides was "overwhelming pervasive, prejudicial, inflammatory, unbalanced, often inaccurate and one-sided against [him]."  (Doc. 1, ¶ 23).  Thus,  Rolling argues, the prospective and the actual jurors who made up the advisory sentencing panel were both presumptively and actually prejudiced against him, and the only remedy which would have accorded him a fair trial would have been to change the venue from Alachua County, Florida.

a.   <u>Clearly Established Supreme Court Law</u>

The Sixth Amendment of the United States Constitution guarantees to a defendant the right to be tried by an impartial jury whose verdict is "based on evidence received in open court, not from outside sources. "  <u>Sheppard v. Maxwell,</u>

---

[4]   This harmless error standard is also applicable to cases involving habeas challenges to death sentences. <u>See</u> <u>Calderon v. Coleman</u>, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); <u>Duest v. Singletary</u>, 997 F.2d 1336 (11th Cir. 1993); <u>Hicks v. Head</u>, 333 F.3d 1280 (11th Cir. 2003).

384 U.S. 333, 351, 86 S. Ct. 1507, 1516,16 L. Ed. 2d 600 (1966). The failure to give an accused a fair hearing violates standards of due process.  Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961).  When pretrial publicity or an inflamed community atmosphere precludes the seating of an impartial jury, a change of venue or a continuance is required. See Rideau v. Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), Sheppard v. Maxwell, supra.  However, due process does not require that qualified jurors be totally ignorant of the facts and issues involved in a case.  See Murphy v. Florida, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).  As stated in Irvin v. Dowd, supra, 366 U.S. at 723, 81 S. Ct. at 1642-43:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on evidence presented in court.

When deciding the question of whether a defendant was denied a fair trial due to an impartial jury a court must consider both presumed and actual prejudice to the defendant.  See Coleman v. Zant, 708 F.2d 541, 544-45 (11th Cir. 1983); Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000).  The Eleventh Circuit Court of Appeals has defined presumed prejudice as follows:  "'where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '[jury] prejudice is presumed and there is no further duty to establish bias.'" Coleman, supra, 708 F. 2d at 544 (citing Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980)).  The test is whether "'an unacceptable risk is presented of impermissible factors coming into play.'" Woods v. Dugger, 923 F.2d 1454 (11th Cir. 1991)(quoting Holbrook v. Flynn, 475 U. S. 560, 570, 106 S. Ct. 1340, 1346, 89 L. Ed. 2d 525 (1986)). The presumptive prejudice standard is "rarely" applicable and is reserved for an "extreme situation;" thus the petitioner's burden is an extremely heavy one.  Coleman v. Kemp, 778 F.2d 1487, 1537 (11th Cir. 1985)(citing Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554, 96 S. Ct. 2791, 2800, 49 L. Ed. 2d 683 (1976)); Woods, supra, 923 F.2d at 1459.  The issue of presumed prejudice is a mixed one of

law and fact.  **Irvin**, **supra**, 366 U.S. at 723, 81 S. Ct. at 1643. A reviewing court must examine the "totality of the circumstances" in evaluating the fairness of a petitioner's trial in light of pretrial publicity.  **See** **Sheppard**, **supra**, 384 U. S. at 352, 86 S. Ct. at 1517.

> **Actual prejudice exists when two prerequisites are satisfied:**

> **First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court."**

**Coleman**, **supra**, 708 F.2d at 544 (citing and quoting **Irvin**, **supra**, 366 U.S. at 723, 81 S. Ct. at 1643).  The Court in **Irvin** elaborated on the issue of actual prejudice as follows:

> **It is not required, however, that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.**

**Id**. at 722-23, 81 S. Ct. at 1642-43. A reviewing court must look to the totality of the circumstances to determine whether actual prejudice exists.  **Murphy v. Florida**, **supra**, 421 U.S. at 799, 95 S. Ct. at 2036.  A trial court's findings of impartiality may be overturned only for "manifest error."  **Patton v. Yount**, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889, 81 L. Ed. 2d 847 (citing **Irvin**, **supra**, 366 U.S. at 723, 81 S. Ct. at 1643).

b.  **Federal Review of State Court Decision Regarding Application of the Presumed Prejudice Standard**

The Supreme Court of Florida's decision in Rolling's case is not "contrary to" clearly established precedent of the United States Supreme Court.  The state court expressly identified **Irvin v. Dowd**, **Sheppard v. Maxwell**, **Murphy v. Florida** and other

Florida cases interpreting these cases[5] and applied those decisions to the facts in Rolling's case. In his present petition, Rolling points to no case decided by the Supreme Court of the United States with facts materially indistinguishable from his own in which the Court reached a different result. Rolling's petition must, then, stand or fall on whether the state court decision constitutes an "unreasonable application" of Supreme Court precedent; in other words, whether the state court's decision was not merely wrong, but objectively unreasonable. <u>Williams</u>, <u>supra</u>, 529 U.S. at 410, 120 S. Ct. at 1522.

Rolling raised this issue on direct appeal of his conviction, and the Supreme Court of Florida thoroughly examined the record and made extensive findings on this issue.  On the issue of presumed prejudice, the state court identified the test for determining a change of venue as "whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom."[6] <u>Rolling I</u>, <u>supra</u>, 695 So.2d at 284 (quoting <u>McCaskill v. State</u>, 344 So.2d 1276, 1278 (Fla. 1977)).  The court noted that in determining the existence of presumed prejudice, the trial court needed to evaluate the extent and nature of the pretrial publicity in Rolling's case and the difficulty in actually selecting an impartial jury.  <u>Id</u>. at 285.  The court also noted that, pursuant to the reasoning in <u>Irvin v. Dowd</u>, the prospective jurors did not need to be ignorant of the facts of the case; they simply had to be able to render a verdict based on the evidence presented in court.  <u>Id</u>.

---

[5]   <u>McCaskill v. State</u>, 344 So.2d 1276 (Fla. 1977); <u>Manning v. State</u>, 378 So.2d 274 (Fla. 1979); <u>Provenzano v. State</u>, 497 So.2d 1177 (Fla. 1986), <u>cert</u>. <u>denied</u>, 481 U.S. 1024, 107 S. Ct. 1912, 95 L. Ed. 2d 518 (1987); <u>Copeland v. State</u>, 457 So.2d 1012 (Fla. 1984); <u>Hoy v. State</u>, 353 So.2d 826 (Fla. 1977), <u>cert</u>. <u>denied</u>, 439 U.S. 920, 99 S. Ct. 293, 58 L. Ed. 2d 265 (1978); <u>Oats v. State</u>, 446 So.2d 90 (Fla. 1984); <u>Davis v. State</u>, 461 So.2d 67 (Fla. 1984), <u>cert</u>. <u>denied</u>, 473 U.S. 913, 105 S. Ct. 3540, 87 L. Ed. 2d 663 (1985).

[6]   The court in <u>McCaskill v. State</u>, 344 So.2d 1276, 1278 (Fla. 1977) noted that the principles of this test were affirmed in <u>Murphy v. Florida</u>, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).

The supreme court further considered the trial court's method and manner of conducting voir dire[7] and found that the trial court's evaluation of the media coverage was consistent with its own review.  The trial court found that while the pretrial publicity had been pervasive, "the approach of the local media has been objective, not directed toward inflaming the citizens or suggesting to them the penalty that ought to be imposed in this case."  Id. at 286 (quoting the trial court's order on Rolling's motion for a change of venue).  The trial court also noted that "photographs of the victims and the crime scenes were not released to the public, and have not been published.  Some of the pretrial publicity was favorable to the position of the Defendant, rather than hostile to the Defendant."  Id.  The state court rejected Rolling's claim that the pretrial publicity presumptively prejudiced him and noted that "[i]ndeed, in light of the fact that Rolling chose not to request a change of venue pretrial, it appears that even he was not concerned or otherwise disturbed by the extent or nature of the coverage at any time during the three years he awaited trial."  Id. at 287.[8]  The court concluded as follows:

> Once again, critical to the issue here is that the trial court found credible the assurances of all the members of Rolling's jury that they could lay aside their extrinsic knowledge of the case and recommend a penalty based only upon the evidence presented in court; and Rolling never challenged for cause any member of his actual jury based on bias or any other grounds.  Rather than revealing a pervasive community bias against him as Rolling suggests, the intricate jury selection process employed in this case and the responses of the actual jurors during questioning shows that is was possible to seat an impartial jury in Alachua County.  In this regard, we must commend the trial court for employing a jury selection process with ample safeguards.

---

[7]   The court noted that the trial court reviewed each of the 1233 responses filed by prospective jurors and summarily excused 800 because they were either exempt or ineligible to serve or qualified for a "hardship" excusal.  The voir dire was conducted in two phases with the first round focusing on attitudes regarding the death penalty, in which panels of twenty to twenty-four persons were questioned together.  The prospective jurors were questioned in front of the other panel members, but were told that they could respond outside the presence of the other panel members if they wished.  The second round of questioning focused on all other matters.  The supreme court stated that "[t]he record reflects that throughout the process, the trial court gave the attorneys wide latitude in questioning prospective jurors.  The [trial] court also liberally granted Rolling's challenges for cause, often over the State's objection, and allotted Rolling six additional peremptory challenges after he exhausted his initial twenty."  Rolling I, supra, 695 at 286.  The court also found that the trial court used a "'strict standard of acceptance . . . in determining which jurors should be retained'" and "'excused those who claimed to have a state of mind that would render them unable to be impartial either to the State or the Defendant.'"  Id. (quoting the trial court's order on Rolling's motion for a change of venue).

[8]   Rolling's counsel made their motion for a change of venue for the first time on the sixth day of jury selection.

> Consequently, because we find that the trial court's system was an effective one which produced an impartial jury, we affirm the trial court's denial of Rolling's motion for a change of venue. Neither the pretrial publicity in this case nor the lengthy jury selection process evidenced a community bias so pervasive as to make it impossible, under any circumstances, to seat an impartial jury in Gainesville.

Id. at 288.

In reading Rolling's federal petition this Court is reminded of the following language from another high profile case:

> Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under Murphy, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere. . . utterly corrupted by press coverage."

Dobbert v. Florida, 432 U.S. 282, 303, 97 S. Ct. 2290, 2303, 53 L. Ed. 2d 344 (1977)(quoting Murphy v. Florida, 421 U.S. at 798, 95 S. Ct. at 2035)). As in Dobbert, Rolling has directed this Court to no evidence which meets the constitutional standard establishing presumed prejudice. The fact that the case was well publicized is not sufficient to establish a constitutional violation. Rolling has not demonstrated that the general state of mind of the inhabitants of Alachua County was "so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." McCaskill, supra, 344 at 1278. In fact the trial court found quite the opposite. In its written order denying the motion for a change of venue the court found as follows:

> An analysis of the publicity given this case by the local media shows that, while the media has kept the public apprised of all court procedures which have not been held in camera, the approach of the local media has been objective, not directed toward inflaming the

citizens or suggesting to them the penalty that ought to be imposed in this case.

(R. 3265).

Rolling has plainly not demonstrated that the state courts applied an incorrect constitutional standard to his case or misapplied the law to the facts in his case. The cases which Rolling cites in his petition all involve facts and circumstances far different from those surrounding his case. The most significant distinguishing factor is that all of the cases cited by Rolling in which presumed prejudice was found involved defendants who had guilt phase trials in the face of extensive pretrial publicity. In Irvin and Rideau the confessions of the defendants had been widely publicized, and in Rideau the defendant's confession had actually been taped and broadcast on local television three times before he was indicted. The Court in Rideau noted that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." Rideau, supra, 373 U.S. at 726, 83 S. Ct. at 1419. The Court in Sheppard v. Maxwell described the defendant's trial as carnival-like and agreed with the following findings of the Ohio Supreme Court:

> Murder and mystery, society, sex and suspense were combined in this case in such a manner as to intrigue and captivate the public fancy to a degree perhaps unparalleled in recent annals. Throughout the preindictment investigation, the subsequent legal skirmishes and the nine-week trial, circulation-conscious editors catered to the insatiable interest of the American public in the bizarre. . . . In this atmosphere of a 'Roman holiday' for the news media, Sam Sheppard stood trial for his life.

Sheppard, supra, 384 U. S. at 356, 86 S. Ct. at 1519 (quoting 135 N. E. 2d at 342). As the court in Murphy noted when reviewing these cases:

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

Murphy, supra, 421 U.S. at 799, 95 S. Ct. at 2036.  Rolling has alleged no such circumstances in his petition.

Again, the fact that Rolling pled guilty to the crimes charged and that an advisory sentencing jury was impaneled is an important factor in analyzing whether presumptive prejudice was present in Rolling's trial.  As the trial court stated in its order denying the venue motion:

> In selecting a jury for the penalty phase only, the jurors cannot be expected to show a presumption of innocence to the defendant who, by a plea of guilty, has admitted that he committed five murders. . . . The mental state of the jurors, therefore, is not equivalent to that expected of jurors who are to decide guilt or innocence.  The question is rather whether the jurors can be fair with respect to the sentence to be imposed, whether they can set aside any preconceived notions of the propriety of a particular penalty, can impartially make a factual determination of the existence of aggravating and mitigating factors and can then give those factors the appropriate weight in recommending a penalty to the court.

(R. 3264).

A review of the record demonstrates that the jury selection process employed by  the trial court comports with constitutional guarantees of a fair trial by impartial jurors under Supreme Court standards. Rolling was not entitled to a jury totally ignorant about relevant events surrounding his crimes.  As the Eleventh Circuit has repeatedly noted, "the principle of presumed prejudice 'is rarely applicable and reserved for extreme situations.'"  Mills v. Singletary, 63 F. 3d 999, 1010 (11th Cir. 1995) cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996); See also, Bundy v. Dugger, 850 F. 2d 1402, 1424 (11th Cir. 1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 849, 102 L. Ed. 2d 980 (1989); Woods v. Dugger, 923 F. 2d 1454, 1459 (11th Cir. 1991), cert. denied, 502 U.S. 953, 112 S. Ct. 407, 116 L. Ed. 2d 355 (1991).  Under the totality of the circumstances, Rolling has simply not met his burden here.

When a state court has made a factual determination regarding an issue after a hearing on the merits, the trial court's findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  The record in this case contains insufficient evidence to rebut the presumption of correctness applicable to state court determinations.  The state courts' factual findings are supported by the

evidence and must be given deference by this Court.  Rolling has failed to show that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  The Court concludes that Rolling's venire was not presumptively prejudiced against him and thus, no habeas relief is warranted on this ground.

   c. **Federal Review of State Court Decision Regarding Application of Actual Prejudice Standard**

   With regard to actual prejudice, the Florida Supreme Court considered whether the parties and the court encountered any difficulty selecting a jury in Rolling's case.  The court noted that while the jury selection process took three weeks, this length of time "was largely attributable to the trial court's extensive and deliberate efforts to ensure that the jurors selected were, without a doubt, impartial and unbiased."  Rolling I, supra, 695 So. 2d at 287.  The court again noted the wide latitude the trial court afforded the parties in their questioning of prospective jurors in order to detect obvious as well as subtle prejudices.  The court noted that "critical to the issue here is that the trial court found credible the assurances of all the members of Rolling's jury that they could lay aside their extrinsic knowledge of the case and recommend a penalty based only upon the evidence presented in court; and Rolling never challenged for cause any member of his actual jury based on bias or any other grounds."  Id. at 288.

   The question here is whether there is fair support in the record for the state court's conclusion that the jurors in Rolling's case would be impartial.  The question of whether a juror can lay aside his or her opinion and render a verdict based on the evidence presented is one of fact.  Thompson v. Keohane, 516 U.S. 99, 109, 116 S. Ct. 457, 464, 133 L. Ed. 2d 838 (1995).  Deference must be given to the trial court's findings on this issue.  Patton, supra, 467 U.S. at 1031, 104 S. Ct. at 2889; See also Miller v. Fenton, 474 U. S. at 114, 106 S. Ct. at 452 (when an "issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court"); Thompson, supra, 516 U. S. at 111, 116 S. Ct. at 465

("This Court has reasoned that a trial court is better positioned to make decisions of this genre [credibility findings regarding juror bias], and has therefore accorded the judgment of the jurist-observer 'presumptive weight.'" (quoting Miller, supra, 474 U.S. at 114, 106 S. Ct. at 452)).

With regard to ambiguous or contradictory testimony of a particular juror, the Court in Patton noted:

> Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

Patton, supra, 467 U.S. at 1039,104 S. Ct. at 2893. As posed by the Court in Patton, "the relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." Id. at 1035, 104 S. Ct. at 2891. The United States Supreme Court in both Irvin and Patton considered whether the totality of the circumstances raised the presumption of prejudice.

Upon review of the record in this case, it appears that the trial court was keenly aware of the pretrial publicity surrounding this case and cognizant of its duty to impanel an impartial jury. Even in Rolling's petition, he acknowledges that "[w]ithin its power, the court tried to be as fair as it could in giving Rolling an impartial jury." (Doc. 1 ¶ 31). Of the approximately 1400 people who received jury summonses, about 1233 prospective jurors actually filed responses. Of those who responded, approximately 1,000 were excused prior to voir dire. The majority of those were excused due to either a hardship or disqualification under Florida law, and only 24 (or approximately 2%) were excused because they had fixed opinions concerning this case and admitted that they could not be fair and impartial.

During phase one of voir dire, the trial court excused all of those who strongly favored the death penalty and those who adamantly opposed it, which eliminated concerns at both ends of the spectrum. As to the rest of the venire, the trial court liberally granted challenges for cause, only disallowing two such challenges. Of

those two, neither venireperson served on Rolling's penalty-phase jury.  The court also allowed Rolling to have additional peremptory challenges, which brought the total to 26 instead of the original 20.  After exhausting all of his peremptories, Rolling requested one additional, which the trial court refused.  Many times over, the venirepersons indicated that they could put their opinions aside and follow the law based upon the evidence presented at sentencing.

Of the final twelve jurors, Rolling points to statements made by ten of them as demonstrative of bias against him.  These statements fall into six categories:

(1) <u>Views on the death penalty</u>:

• <u>Juror Stubbs</u> - While engaging in dialogue with one of his voir dire examiners, Stubbs admitted that he "could impose the death penalty with no problem" even though he would not be joyous about such a result (Doc. 7, Ex. A-8, p. 916).

• <u>Juror Coleman</u> - "I feel that the death penalty, depending on the case, is a legitimate type of penalty, but it just totally depends on a case-by-case basis" (<u>Id</u>., p. 1025).

• <u>Juror Kerrick</u> - When asked whether there were any types of offenses for which the death penalty should be automatically applied, she responded, "Possibly premeditated murder" (<u>Id</u>., Ex. A-7, pp. 346-47).

• <u>Juror McDaniel</u> - She stated that the death penalty "should be enforced in certain instances," such as "premeditation."  She further explained that, "to actually sit there and calculate something in their mind to take the life of another human being, I think it should be enforced" (<u>Id</u>., pp. 333-34).

• <u>Juror Tignor</u> - When questioned about her attitude toward the death penalty, she said, "I am for it if someone has committed crimes like these.  I will listen and try to weigh everything out, but right now I am for it" (<u>Id</u>., Ex. A-8, p. 907).  In addition, when

asked if Gainesville would be a safer place after executing Rolling, she answered, "Probably" (Id., p. 908).

• **Juror Williams** - "I think, from what I have read and seen and heard, that nothing would change my mind; that he would still deserve the death penalty" (Id., p. 978).

(2) **Mitigation**:

• **Juror Kerrick** - After stating that some factors may be appropriate for mitigation, she said that "very strong evidence would have to be presented for me to change my mind about the death penalty" (Id., Ex. A-7, p. 347).

• **Juror Segura** - He said that he was for the death penalty no matter what the mitigation might be (Id., Ex. A-8, p. 819).

(3) **Media Influence**:

• **Juror Williams** - She said that, "the descriptions in the paper were so vivid that I don't know that I could look at the pictures" (Id., p. 988).

• **Juror Bass** - When asked whether she heard Mario Taboada's (a brother of one of the victims) statements concerning his feelings towards Rolling, she answered that, when she realized what the statements concerned, she walked out of the room without hearing his opinion (Id., Ex. A-7, p. 172).

(4) **Frightened by the Murders**:

• **Juror Bass** - She said that she felt "frightened" and "victimized" by the murders in 1990 when they occurred (Id., p. 224).

(5) **Potentially Influenced By Others**:

• **Juror Bass** - She admitted to having been given opinions by others regarding what Rolling's sentence ought to be. She stated that her response was always, "I don't know anything until I have heard the evidence and I can't say" (Id., pp. 154-55).

• <u>Juror Sajczuk</u> - Others offered her opinions on the case, but she told them things like "[d]on't talk to me" and "leave me alone" (<u>Id</u>, Ex. A-8, pp. 1670, 1673).

• <u>Jurors Green, Staab, and Stubbs</u> - similar experiences as Bass and Sajczuk (<u>Id</u>., pp. 1778, 2050).

(6) <u>Personally Knew a Victim</u>:

• <u>Juror Bass</u> - She admitted that, although not sure, she might have gone to school with Christina Hoyt, who was one of Rolling's victims.  However, she testified that they were not close friends and that her opinion of the case would not be unduly influenced by having gone to school with Ms. Hoyt (<u>Id</u>., pp. 109-110).

On review of the voir dire proceedings, there is no indication from the juror responses that there was an atmosphere of hostility toward Rolling.  The jury panel in this case knew that Rolling was guilty.  He had pled to five counts of first degree murder the day before jury selection began.  In addition, all penalty-phase jurors gave assurances to the court that they could set aside their views, listen to the evidence presented, and follow the law.  The Court also notes that Rolling did not challenge for cause any of the final jurors due to bias or any other ground.

Another factor that ordinarily militates against a finding of actual prejudice is the lapse of time between the pretrial publicity immediately surrounding the time of the crime and the time when the defendant is tried for the offense.[9]  "That time soothes and erases is a perfectly natural phenomenon, familiar to all."  <u>Patton</u>, <u>supra</u>, 467 U.S. at 1034, 104 S. Ct. at 2890 (cite omitted).  Rolling's sentencing trial was held three and a half years after the offenses occurred and while prospective jurors still remembered the case, the record reflects that much of the emotion

---

[9]  In <u>Patton</u>, the defendant was retried for the crime a second time some four years later, and the court found that "[t]he voir dire testimony revealed that this lapse in time had a profound effect on the community and, more important, on the jury, in softening or effacing opinion."  <u>Patton v. Yount</u>, 467 U.S. 1025, 1033, 104 S. Ct. 2885, 2890 81 L. Ed. 2d 847 (1984).

surrounding the offenses had cooled.  As the trial court stated in its order denying Rolling's motion for post-conviction relief:

> . . . the parties had the benefit of a study done by Michael Herkov, Ph.D, a professor of psychiatry at the University of Florida.  The "Herkov report", as it came to be known, documented the effect of the murders on Gainesville residents over a period of eighteen months.  The study found that most, if not all, of the emotional distress linked to the murders abated over time. Herkov noted that most individuals regained "psychological balance" within nine to twelve months and concluded, "For most people, psychological distress began to diminish as [sic] within a year after the murders[,] with most residents appearing to return to baseline by 18 months."
>
> Added support for this proposition came from the attrition rate of the study.  Of the 164 questionnaires completed and returned, only 30 subjects participated in the final 18-month data collection.  Herkov attributed this dropoff to the "decreasing saliency of the murders to community residents . . . . many [of whom] appeared to lose interest and motivation with time." [citations omitted]

Order Denying Motion For Post-Conviction Relief, p. 25 (Doc. 7, Exhibit D).

Keeping in mind that the trial court's findings are entitled to a presumption of correctness under 28 U. S. C. § 2254(e)(1), the Court finds insufficient evidence in the record to rebut the presumption of correctness applicable to the state court determinations and ultimately concludes that Rolling's venire was not actually prejudiced against him.  Rolling has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Therefore, no habeas relief is warranted on this ground.

2.    Ineffective Assistance of Counsel Regarding Venue Issue

In the second part of his venue claim, Rolling alleges that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution.  He alleges that his counsels' failure to file a motion for a change of venue in a timely manner and to properly gather the evidence to support

this motion denied him a fair sentencing.[10]  Rolling raised this issue in his Rule 3.850 motion, and the trial court found that the issue was procedurally barred, but addressed the merits of the claim and declared it to be without merit.  The Supreme Court of Florida addressed the claim in its review of the trial court's order and also held that Rolling's claim of ineffective assistance of counsel was procedurally barred based on its thorough treatment of the venue issue in its opinion on direct review.  See Rolling II, supra.  However, the court also reviewed the claim and found it to be without merit.

The respondents raised the issue of a procedural bar in their response (doc. 7).  "When a defendant is barred from raising a federal constitutional claim in the state courts because of his failure to follow the state's procedural rules, he is also barred from raising the claim in his federal habeas petition absent a showing of cause for, and actual prejudice from, the procedural default."  Pitts v. Cook, 923 F. 2d 1568, 1571 (11th Cir. 1991) (citing Engle v. Isaac, 456 U.S. 107, 102 S. Ct. 1558, 71 L. Ed 2d. 783 (1982)); Wainwright v. Sykes, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).  Rolling has not demonstrated good cause for nor actual prejudice from the default thus, this claim is procedurally barred.  However, even assuming Rolling had made the requisite showing or assuming the ineffective assistance claim was not barred, the claim is without merit.

a.   Clearly Established Supreme Court Law

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that:  (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d

---

[10]   Rolling also alleged in his 3.850 motion that his trial counsel was ineffective due to an actual conflict of interest based on the public defender's office's previous representation of two of the state's witnesses, Russell Binstead and Bobby Lewis, discussed infra.  Rolling's habeas petition raises the issue as well.  Both the trial court and the supreme court found Rolling's allegations to be without merit.  This Court fully concurs with these opinions and, therefore, gives this issue no additional discussion.  See Rolling II, 825 So.2d at 295 n. 3. See also Cuyler v. Sullivan, 446 U.S. 335, 349, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); Mickens v. Taylor, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); Freund v. Butterworth, 165 F.3d 839 (11th Cir. 1999), cert. denied, 528 U.S. 817, 120 S. Ct. 57, 145 L. Ed. 2d 50 (1999).

674 (1984).   "The purpose of ineffectiveness review is not to grade counsel's performance."  Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing Strickland).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  Id. at 1314.  Hence, conclusory allegations of ineffective assistance are insufficient to satisfy the Strickland test.  Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) (citing Blackledge v. Allison, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629, 52 L. Ed. 2d 136 (1977)).  Further, in evaluating the reasonableness of counsel's actions, a court must make "every effort  . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time."  Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065.  As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance:  "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance."  Waters [v. Thomas, 46 F.3d 1506], 1522 (en banc).  Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

Chandler, supra, 218 F.3d at 1314 (footnote omitted).

    Counsel's strategic choices on which defense to pursue are "'virtually unchallengeable.'"  Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (quoting Strickland).  Because lawyers often face considerable time and financial limitations, they may reasonably rely on their own judgment in deciding whether to forgo investigation of a possible line of defense.  Chandler, supra, 218 F.3d at 1318 & n.22.  The mere existence of alternate strategies or approaches, even better ones, does not render counsel's strategy ineffective.  Id. at 1314.  Counsel cannot be found incompetent "as long as the approach taken 'might be considered sound trial strategy.'"  Id. (quoting Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464, 2474, 91 L. Ed. 2d 144 (1986)).  Petitioner bears the heavy burden of persuasion to disprove that counsel's performance was competent and reasonable by showing that no

competent counsel would have chosen the course of action that his counsel in fact took.  Id. at 1314-15 & n.16.

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct. By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact, so we decide it de novo.  See Jackson v. Herring, 42 F. 3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F. 2d 1449, 1462 (11th Cir. 1991); Bundy v. Wainwright, 808 F. 2d 1410, 1419 (1987).

Provenzano, supra, 148 F. 3d at 1330.

To succeed on a claim of ineffective assistance of counsel under Strickland, a petitioner must show both incompetence and prejudice, and a petitioner's burden of demonstrating prejudice is quite high.  Wellington v. Moore, supra, 314 F.3d at 1260.  The Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Id. (quoting Strickland, 466 U.S. at 693, 104 S. Ct. at 2067).   Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068.   The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," because the court should presume that the judge or jury acted according to law.  Id. 466 U.S. at 694-95.

### b.  Federal Review of Ineffective Assistance of Counsel Claim

The state court in affirming the trial court's denial of Rolling's petition for post-conviction relief quoted from the trial court's order denying his motion for post-conviction relief as follows:

> The record is replete with evidence that these [defense] attorneys did everything in their power to ensure that the adversarial process functioned as it should in our system of justice. . . . this case is a textbook example of strategic thinking and careful planning by skilled defense attorneys whose reputations amongst other members of the

**Florida bar . . . bespeak their effectiveness. . . .  There is nothing counsel could have done in the voir dire process itself that would have increased this Court's scrutiny of each venireman, heightened the Court's observations, or increased the Court's attention to the reasonable doubt standard to which each juror was held. . . . In the final analysis, the difficulty with the defense team's case lay not in combating the extensive media coverage, but in the detailed confessions that came from the hand and mouth of their own client and the stark reality of the acts visited upon his victims. . . . Any challenge to the integrity of the proceedings that occurred must be measured against the gravity of the offenses and the total absence of innocence, or even the thought of innocence, of Rolling in the minds of the advisory jury.  That would occur no matter where the case was tried. . . . The reality being overlooked in this argument is the entire history of the voir dire and the events underlying it.  Perhaps the jury simply believed, after a full consideration, that the aggravating circumstances were not outweighed by the mitigators presented on Rolling's behalf.**

Rolling II, 825 So.2d at 297-98.

With regard to whether Rolling's trial counsel was ineffective in waiting to

move for a change of venue until voir dire had begun, the court noted that:

**Based on years of experience and discussions with attorneys from throughout Florida as a member of the Death Penalty Steering Committee, [Richard] Parker [one of Rolling's defense counsel] explained that Alachua County's venire is generally viewed as being "more open-minded, more understanding, and more willing to consider life recommendations as opposed to death sentences."  Parker further explained that the defense's strategy was to seat jurors who were especially willing to consider mental health mitigation.    Parker reiterated that the defense team had several long discussions regarding venue, including the possibility of moving for a change of venue should it become necessary.**

Id. at 299.  Another of Rolling's defense counsel, John Kearns, when asked at the

post-conviction evidentiary hearing why the defense did not seek a change of venue

before trial explained as follows:

**. . . the general reputation Alachua County shares as being a favorable venue for these types of issues, the fact that the Gainesville Sun, the largest newspaper in this community, is very actively against the death penalty and devotes quite a bit of editorial space to that topic, and the fact that we know from experience, in looking at the results of death penalty litigation, at least from the northern part of the state where we can make comparisons, that this is a favorable venue to try and do**

capital litigation–once again, the make up of the community, because of the education and because of the high medical community itself in Gainesville, and considering the issues I was going to have to be arguing in mitigation, I had to weigh these factors.

Id.

Dr. Raymond Buchanan, an expert hired by the defense team to assist with media analysis, acknowledged that while he believed that a change of venue was initially warranted, upon talking with the defense team he came to believe that Alachua County was the best place to hold Rolling's sentencing. The court quotes Dr. Buchanan's post-conviction evidentiary hearing testimony as follows:

I think that they [Rolling's defense team] laid out the evidence, their intuitive, qualitative feelings about this, and I–you know, I found it to be sensible and reasonable, and at the time that I heard these things, it did sound reasonable. *And, you know, when I put myself back in that time frame, knowing what we knew then, it was reasonable. There was nothing unreasonable about it.*

Id. at 300-01. The court concluded that Rolling's defense counsel's decision not to seek a change of venue before trial started was not outside the wide range of professional assistance pursuant to Strickland, supra. Id.

With regard to whether Rolling's trial counsel was ineffective for failing to adequately support his motion for a change of venue, the court again quoted from the trial court's order denying post-conviction relief as follows:

A glance through the motions for protective orders and motions to prohibit public disclosure is ample reminder that for three years, the defense team took every opportunity possible to bring to this Court's attention the considerable publicity surrounding this case. It is difficult to fathom what else counsel could have done to make this jurist more acutely aware of the circumstances of this case prior to jury selection.

Id. at 301-02. The trial court also rejected Rolling's claim that his counsel was deficient for not conducting a survey to support the need for a change of venue. The supreme court found that it is unlikely that the trial court would have given such a survey much weight, particularly when it could assess the jurors during voir dire. Id. at 302.

Finally, the state court evaluated Rolling's claims for post-conviction relief under the prejudice prong of Strickland, supra, and found that Rolling had failed to

show that "'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Id.  (quoting Strickland, supra, 466 U.S. at 694.)  The state court found that the trial court was well aware of the pretrial publicity in the case when ruling on the motion for a change of venue.  The court also noted that it had conducted an independent evaluation of the circumstances in its direct review of Rolling's conviction and had also rejected Rolling's claims of presumed and/or actual juror prejudice.

A review of the record in this case shows that Rolling's trial counsel made a deliberate and informed tactical decision to have the case tried in Alachua County.  See Rolling II, supra, 825 So. 2d at 301.  That decision was informed by years of counsels' experience with both capital and non-capital Alachua County juries.  See id.  As stated in Provenzano, supra, 148 F.3d at 1332, "[o]ur strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." At the evidentiary hearing on Rolling's 3.850 motion, his trial counsel testified that they had weighed, at length, the pros and cons of a venue change before making the initial team decision to forgo pursuing such a motion.  Strategic decisions of this nature are virtually unchallengeable.  See Strickland, supra; Provenzano, supra, 148 F.3d at 1332 ("cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between, and cases in which deliberate strategic decisions have been found to constitute ineffective assistance of counsel are even fewer and farther between."); Weeks v. Jones, 26 F.3d 1030 (11th Cir. 1994).

As part of the defense counsels' efforts to preserve Rolling's right to a fair trial in Alachua County, the record reflects numerous pretrial motions which were made with the purpose of prohibiting public disclosure of the facts and evidence surrounding Rolling's case.[11] The trial court also noted that defense counsel was well aware of the publicity surrounding the student murders and made early efforts to

---

[11]   The trial court's order denying post-conviction relief noted that the pleading "index shows four pleadings relating to the grand jury; ten pleadings concerning protective orders; eight pleadings regarding public disclosure of materials and/or in camera inspections; eight pleadings relating to suppression of evidence; four pleadings regarding voir dire (including the motion for change of venue); five jury-related documents; and at least twenty-nine other motions." Order Denying Motion for Post-Conviction Relief, p. 33 (Doc.7, Exhibit D).  See also doc. 7, n. 21.

protect Rolling's rights by attempting to preserve all possible issues for him.  **See Order Denying Motion for Post-Conviction Relief, pp. 15-17.**  The record supports the finding that the decision not to seek an earlier venue change was part of a carefully reasoned strategy.  Rolling has not shown that "no competent counsel would have made such a choice."  **Provenzano**, **supra**, 148 F.3d at 1332.

While the defense team made the tactical decision not to seek a change of venue prior to jury selection, once voir dire began it became clear to them that they had underestimated the impact Rolling's guilty plea would have on the penalty phase of the trial.   As the trial court noted in its order denying post-conviction relief "[r]ather than focus on possible defenses, the only choice left was to empanel a jury that would understand and appreciate mitigating factors.  The focus of the original defense strategy for trial had now dramatically shifted to one of sentencing."  Order Denying Motion for Post-Conviction Relief p. 21 (Doc.7, Exhibit D).  The importance of having jurors who were receptive to mitigating factors became paramount.  As Dr. Buchanan testified in the evidentiary hearing:

> We were looking at a community and saying this is a community that, you know, is liberal politically.  It's a community with a lot of educated people who are open-minded, who can handle a lot of things.  And I think that when it came right down to it, in this particular case, the community and us, had grabbed ahold [sic] of something that was far more difficult to handle than any of us ever anticipated.
>
> * * *
>
> I think as time rolled along, we kept realizing, we realized more and more, and especially as we were getting direct feedback and direct data from these jurors, we kept sensing more and more that there was something here far beyond what we had anticipated, based on this community.
>
> * * *
>
> I don't think our past experience did, in fact, give us data on [how deeply affected Gainesville residents were by the crimes].  I think we had to collect that data, you know, as we went along.  And collecting it, we were collecting it intuitively. We were collecting it qualitatively, meaning we were listening, we were watching, we were observing, we were seeing how people reacted.  And the more we saw, the more we observed, the more concerned we became that these people were not

acting as they had normally reacted in other trials that Johnny [Kearns],
for example, was familiar with.

Order Denying Motion for Post-Conviction Relief, p. 26-27, 28 (Doc. 7, Exhibit D).

When questioned during the evidentiary hearing about the trouble encountered in selecting a jury which would be favorable to mitigation evidence, Mr. Kearns (Rolling's primary penalty phase attorney) theorized that Rolling's guilty plea had an effect on the prospective jurors as follows:

> I don't want to get too esoteric here. Residual doubt, from studies that I have seen, is one of the most significant factors for why jurors will vote for life. Even though they have to find guilt above and to the exclusion of every reasonable doubt to get from the guilt/innocence phase to the sentencing phase when they make that determination there is, in people's minds, a distinction between proof above and to the exclusion of every reasonable doubt, and: I'm absolutely certain, absolutely not even any scintilla of doubt in my mind.
> Now, when you come to the issue of: Am I going to recommend that a person's life be taken, all of a sudden, that magnifies that gap between the two even bigger.
> That is no longer present in the situation in Mr. Rolling's case. And because of the facts now being as bad as they are, and the doubt being eliminated as to who perpetrated them, those with ambivalent feelings had their ambivalent feelings tilted toward saying: Okay, I guess even though I am concerned about death penalty, facts of this particular nature, I could give the death penalty in this case, or I have feelings that it would be easier for me to do this in this case because of the facts now that I know.
> So that becomes a huge problem. And at the end of that week I had very bad feelings about Alachua County.

(T. 467-468).

When asked if in making the motion for a change of venue Mr. Kearns had thought of a better place to hold the sentencing given his concerns about the jurors' attitudes about the guilty plea, he testified, "[n]o. It was: It doesn't look like we're going to be able to prevail here in Alachua County. I know we're not here. I don't know about other places, but I'm willing to try the other place at this point." (T. 469). He also testified that the residual doubt concerns would have been present anywhere the case was tried. Id.

The fact that the defense team changed their minds after voir dire began does not render their initial decision not to move for a change of venue earlier unreasonable.  They used their collective knowledge and experience as well as the expertise of Dr. Buchanan to make an informed decision on venue, and their decision falls within the range of reasonable professional assistance.  Moreover, there is no evidence suggesting that a change of venue would have led to a different outcome for Rolling.  As the trial court stated in its order denying post-conviction relief, "[a]ny challenge to the integrity of the proceedings that occurred must be measured against the gravity of the offenses and the total absence of innocence, or even the thought of innocence, of Rolling in the minds of the advisory jury.  That would occur no matter where this case was tried."[12]  Rolling II, supra, 825 So. 2d at 297-98.

Considering the second prong of the Strickland standard, Rolling was not prejudiced by the alleged deficient conduct of trial counsel.  He has not demonstrated that, but for counsel's alleged unprofessional errors, the outcome of the proceeding would have been different.  He has presented no persuasive evidence or argument that had the motion for a change of venue been granted he would have likely received a sentence of life instead of death.  Also, Rolling did not identify any evidence demonstrating a reasonable probability that the trial court would have granted either a timely or more well-supported motion for change of venue.  The Supreme Court of Florida determined that "prior to filing the motion for change of venue, trial counsel had repeatedly brought the issue of pretrial publicity to the trial court's attention."  Id. at 301.  A timely motion based upon the same or similar evidence would have most probably yielded the same result.  Accordingly, no habeas relief is warranted on this ground.

**B.  Ground Two:    Denial of Rolling's Fifth Amendment Right to Be Free From Self-Incrimination and Sixth Amendment Right to Counsel**

In his second claim Rolling contends that the trial court erred in denying his motion to suppress certain incriminating statements that he made to Gainesville

---

[12]   Rolling's habeas petition refers several times to the Theodore Bundy case which was moved from Leon County, Florida to Dade County due to the publicity surrounding the crimes committed there; however, notably, even with the venue change Mr. Bundy was convicted and sentenced to death.  See Bundy v. State, 455 So.2d 330 (Fla. 1984), cert. denied, 476 U.S. 1109, 106 S. Ct. 1958, 90 L. Ed. 2d 366 (1986).

Homicide Task Force investigators on January 18, 1993, January 31, 1993, and February 4, 1993, as well as all other written and oral statements made to Bobby Lewis, one of Rolling's fellow inmates.  Rolling maintains that his "Fifth Amendment right to be free from self-incrimination and Sixth Amendment right to counsel" were violated in connection with the statements that he made to both Lewis and law enforcement.  (Doc. 1 ¶ 86(c)).  In his habeas petition Rolling argues that the trial court erred in finding that: (1) his statements to Lewis and to law enforcement officers did not violate his right to counsel because Lewis was not acting as an agent of the State; and (2) Assistant State Attorney Jim Nilon's involvement in the interrogations of Rolling was not unethical and did not warrant suppression of Rolling's statements.

      1.   <u>Clearly Established Supreme Court Law</u>

The Sixth Amendment to the United States Constitution applies to post-indictment communications between the accused and agents of the government. Such agents are prohibited from deliberately eliciting incriminating statements in the absence of counsel after the accused has been indicted.  See <u>Massiah v. United States</u>, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203, 12 L. Ed. 2d 246 (1964).  "[T]he clear rule of <u>Massiah</u> is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him."  <u>Brewer v. Williams</u>, 430 U.S. 387, 400, 97 S. Ct. 1232, 1240, 51 L. Ed. 2d 424 (1977).  In <u>United States v. Henry</u>, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), the Court applied the principle of <u>Massiah</u> in the jailhouse informant context. "In order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent, and (2) that the inmate deliberately elicited incriminating statements from the accused." <u>Lightbourne v. Dugger</u>, 829 F. 2d 1012, 1020 (11th Cir. 1987), <u>cert</u>. <u>denied</u>, 488 U.S. 934, 109 S. Ct. 329, 102 L. Ed. 2d 346 (1988) (citing <u>Henry</u>, 477 U.S. at 270, 100 S. Ct. at 2186; <u>United States v. Taylor</u>, 800 F. 2d 1012, 1015 (10th Cir. 1986)).

No bright-line rule exists for determining whether an individual is a government agent for purposes of the Sixth Amendment's right to counsel.  See <u>Depree v.</u>

<u>Thomas</u>, 946 F. 2d 784, 793-94 (11th Cir. 1991).  That determination must be made on the facts and circumstances of each case.  <u>See id</u>. at 794; <u>Lightbourne</u>, <u>supra</u>, 829 F. 2d at 1020.  "At a minimum, however, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place."  <u>Depree</u>, <u>supra</u>, 946 F. 2d at 794 (citing <u>Lightbourne</u>, 829 F. 2d at 1020).  Concerning such "deliberate" elicitation, the United States Supreme Court has commented that:

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.  Since "the Sixth Amendment is not violated whenever–by luck or happenstance–the state obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police.  Rather the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

<u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459, 106 S. Ct. 2616, 2630, 91 L. Ed. 2d 364 (1986) (citing <u>Henry</u>, <u>supra</u>, 477 U.S. at 276, 106 S. Ct. at 2189)).

    2.  <u>Federal Review of State Court Decision</u>

In its order on the pretrial motion to suppress, the trial court considered the statements Rolling made on January 18, January 31, and February 4, 1993, as well as the issue of Mr. Nilon's alleged ethical violations.  The court found that Rolling's privilege against self-incrimination was not abrogated by the state because Rolling "failed to establish that there was any such state action.  Lewis was at no time an agent of the State, nor was the state involvement such that Lewis's actions with respect to the Defendant are in any way attributable to the State." Order on Motion to Suppress (R. 1843).  The court further found :

> In this case, the Defendant knew and intended that all statements made by him to Lewis and, to a lesser extent, to Binstead, would be repeated to law enforcement officers.   The Defendant intended that his statements to Lewis would be used by Lewis for Lewis's own benefit, and that they would be relayed to law enforcement.   It was the Defendant's purpose that Lewis be a witness against the Defendant, and

that Lewis profit from the arrangement.  There was, therefore, no assumption that the statements to Lewis would be held in confidence.

(R. 1844).

Finally, with regard to Mr. Nilon's conduct, the trial court found that no ethical violation had occurred and that his behavior was in conformity with the ethical rules regulating the Florida Bar.  The court found that Mr. Nilon "made himself available to render such advice as was appropriate under the circumstances. . . .that he did not participate in any of the interviews with [Rolling]. . . .and [t]he fact that Mr. Nilon was in geographic proximity to the site of the interview . . . does not rise to a level of a violation of the Code of Professional Responsibility."  (R. 1845).

The Florida supreme court affirmed the trial court's denial of the motion to suppress and applied clearly established Supreme Court precedent in doing so.  The court applied the principles set out in Massiah, Henry and Moulton, supra, and reviewed and adopted the trial court's findings of fact.  The court noted that these cases focus on the role of law enforcement, and how extensive that role is in securing an indirect confession, and conclude that "a violation of a defendant's right to counsel turns on whether the confession was obtained through the active efforts of law enforcement or whether it came to them passively."  Rolling I, supra, 695 So.2d at 291.

The court found that the record clearly supported the trial court's finding that Bobby Lewis was not acting as a government agent when he elicited incriminatory statements from Rolling.  The court noted as follows:

The record supports the trial court's description of Lewis's persistent attempts to strike a deal with the State even in the face of numerous responses from the State that no deal would be forthcoming.  The record also supports the trial court's conclusion that prison officials did not house Rolling and Lewis in close proximity to each other or grant Lewis privileges as a trustee in order to facilitate or encourage Lewis in his efforts to gain information from Rolling about the homicides.  Rather, we find that prison officials acted in accordance with Department of Corrections policy and guidelines when they granted the independent requests of Rolling and Lewis to be placed in the "protective management" program.  Finally, we find that the record and relevant caselaw clearly support the trial court's conclusion that Rolling's right

**to counsel was not violated because Bobby Lewis was not acting as a government agent when he elicited incriminatory statements from Rolling or served as Rolling's "mouthpiece" during the January 31 and February 4 interviews with Task Force investigators.**

Id.  The court concluded that "[t]he repeated interactions between law enforcement and prison officials and Bobby Lewis were necessitated solely by Lewis's refusal to take no for an answer and his own opportunistic strategy to somehow benefit from the relationship he cultivated with Rolling."  Id. at  292.  Lewis apparently believed that he could benefit financially by selling Rolling's story to Sondra London, a writer and Rolling's finance with whom Lewis had previously collaborated, or obtain his freedom or a reduced sentence by testifying against Rolling.  The court also affirmed the trial court's finding that Mr. Nilon did not participate in any interrogations with Rolling and was present simply to protect Rolling's constitutional rights.  Id.

As an initial matter, in their response to Rolling's habeas petition, respondents assert that this issue has not been properly preserved because by pleading guilty Rolling waived any constitutional infirmity with regard to pretrial motions.  (Doc. 7, p.115).  No case law was cited to support this argument.  The supreme court addressed this issue and rejected it finding that Rolling was not challenging the trial court's denial of his motion to suppress as to the validity of his guilty plea, but challenged the ruling as it relates to evidence admitted in the penalty phase of the proceedings.  Rolling I, supra, 695 So.2d at 288, n. 6.  The court found that Rolling's statement to Lewis and law enforcement officers was offered to support three of the aggravating factors: in the course of a sexual battery; heinous, atrocious, or cruel; and cold, calculated, and premeditated.  Id.  This Court agrees with the state court that Rolling's guilty plea does not preclude him from raising these Fifth and Sixth Amendment claims as they relate to the penalty phase of his trial.  The statements Rolling made were used to support the aggravators which led to the imposition of Rolling's death sentence, not to the issue of guilt.

After a plenary review of the record, this Court finds insufficient evidence to rebut the presumption of correctness applicable to state court determinations and concludes that Rolling's Fifth and Sixth Amendment rights were not violated.  While

in his petition Rolling attempts to demonstrate affirmative action taken by prison officials and members of the task force to elicit incriminatory statements from him, he simply has not shown that there was any stratagem on the part of the state to deliberately elicit these statements.   In testimony taken at the evidentiary hearing on Rolling's 3.850 petition, both Lewis and Binstead denied that they ever had a deal with the state. (T. 6742, 6745 & T. 7723-7725).  Lewis's attorney, Robert Link, also testified that he could not work out a deal with the state on Lewis's behalf and he advised Lewis that there were no deals.  (T. 6776-6778).  Rolling's habeas petition even acknowledges that the state made no overt promises to Lewis (Doc. 1, ¶ 133). A review of the record shows that Lewis and to a lesser extent Binstead were opportunists who saw in Rolling a chance to improve their position at the prison. Rolling's susceptibility to their ploys does not equate to an affirmative state action. Furthermore, as stated in  Illinois v. Perkins, 496 U. S. 292, 296, 110 S. Ct. 2394, 2397, 110 L. Ed. 2d 243 (1990):

> Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*.  The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.  Coercion is determined from the perspective of the suspect. (Cites omitted).  When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking.

Finally, with regard to Rolling's contention that his Fifth Amendment privilege against self-incrimination was violated, the trial court found in its Order on Motion to Suppress as follows with respect to Rolling's January 18, 1993, statement to investigators:

> First, although the Defendant was in custody, the Defendant himself sought the meeting with law enforcement officers and initiated the conversation with the officers.  Law enforcement officers were first notified of the Defendant's request when they were told, by Captain Davis, that he had received a request from the Defendant from Lewis. When the law enforcement officers were first informed of this request, they asked Captain Davis to verify the request by asking the Defendant directly if that was what he wanted. . . . On being asked by Captain Davis whether it was the Defendant's wish to talk with Task Force

investigators, the Defendant replied, "Yes sir, I do and God bless you, Captain."

Second, an analysis of the conversation between the officers and the Defendant shows that there was no "interrogation" of the Defendant by the officers.  The only questions asked by officers were in an effort to clarify a list of conditions submitted by the Defendant to the officers . . . .When the conditions were made clear, the officers informed the Defendant that they could not comply with them and that they would make him no promises.  They  took no further statements, terminated the interview, and did not question the Defendant about the homicides.  Under these facts, there was no "custodial interrogation" of the kind proscribed under Miranda v. Arizona and subsequent cases.

(R. 1838-1839).  With regard to Rolling's statement of January 31, 1993,  the trial court found in its Order on Motion to Suppress that:

The Defendant initiated contact with law enforcement officers . . . .At the outset, the officers took great pains to insure that the Defendant was aware of his privilege against self-incrimination.  They provided the Defendant with a copy of his prior "Notice of Invocation" of the privilege, which the Defendant read aloud.  They also provided the Defendant with a written copy of the "Miranda" rights, which the Defendant read aloud.  They explained the concept of waiver of the rights in great detail.  In fact, at one point in the process, the agents were prepared to terminate the interview, and, indeed, announced that the interview was terminated because the Defendant showed a reluctance to waive the privilege.  His reluctance was based, not on his unwillingness to talk with law enforcement officers, but on his desire to have Lewis act as his intermediary.  Once the officers indicated that they would permit him to speak through Lewis provided that he verified what Lewis said, the Defendant readily agreed to waive his right to remain silent.  An analysis of the recordings and transcript of the interview show clearly that the Defendant understood what he was doing and that he not only made a knowing and voluntary waiver, but he affirmatively wished to waive his privilege in order that Lewis would be able to relay his statement to law enforcement officers.

(R. 1839-1840).  Finally, the trial court found that the February 4, 1993, interview followed the same pattern.  The supreme court also found that Rolling made a valid waiver on both January 31, 1993, which was audiotaped, and on February 4, 1993, which was videotaped.  Rolling I, supra, 695 So. 2d at  290.

The state courts' factual findings are supported by evidence and must be given deference by this Court.  Rolling has the burden under 28 U.S.C. § 2254(e)(1) to rebut

the state courts' factual determinations as to this issue with clear and convincing evidence.   The mere statements offered by Rolling in his petition do not satisfy this high standard.   Rolling has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.   Therefore, no habeas relief is warranted on this ground.

> C.      Ground Three:  Rolling's Fourth Amendment Right to Be Free From Unreasonable Search and Seizure

In his third claim Rolling contends that the trial court erred by denying his motion to suppress physical evidence that he argued was seized in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. However, this Court is precluded from reviewing that claim.

Federal courts are precluded from conducting post-conviction review of a petitioner's Fourth Amendment claim of an unconstitutional search or seizure if the state courts provided "an opportunity for full and fair litigation" of that claim.  See Stone v. Powell, 428 U.S. 465, 494, 96 S. Ct. 3037, 3052, 49 L. Ed. 2d 1067 (1976); See also Bradley v. Nagle, 212 F. 3d 559, 564 (11th Cir. 2000) cert. denied, 531 U.S. 1128, 121 S. Ct. 886, 148 L. Ed. 2d 794 (2001); Huynh v. King, 95 F.3d 1052, 1058 (11th Cir. 1996).  This bar applies without regard to whether the defendant actually availed himself of the opportunity to fully and fairly litigate such a claim.  See Huynh, 95 F.3d at 1058 (citing Caver v. State of Alabama, 577 F. 2d 1188, 1192 (5th Cir. 1978)).  "In Stone, the Court reasoned that, so long as a defendant had the opportunity to present his Fourth Amendment claims to the state trial and appellate courts, the objectives of the exclusionary rule have been satisfied."  Bradley, supra, 212 F. 3d at 564-65. "'[F]ull and fair consideration' of a fourth amendment claim [includes] at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute."  Caver, supra, 577 F. 2d at 1191-92 (citing O'Berry v.

Wainwright, 546 F. 2d 1204, 1213 (5th Cir. 1977)).[13]  Furthermore, even if a state court erred in its Fourth Amendment analysis, a federal court will not consider the merits of a Fourth Amendment claim.  See Swicegood v. State of Alabama, 577 F. 2d 1322, 1324 (5th Cir. 1978).

In the present habeas petition, Rolling does not argue that he was denied the opportunity to present facts to the trial court or to argue the issue before an appellate court.  In fact, Rolling did both.  A full and fair evidentiary hearing on Rolling's motion to suppress was conducted by the trial court.  After conclusion of the hearing, the trial court issued a written order denying the motion (R. 1772-1782).  In that order, the trial court made extensive and express findings of fact in relation to Rolling's Fourth Amendment claim.  In addition, the trial court, applying the correct standards of federal law to the facts, denied Rolling's Fourth Amendment claim on the merits.  That determination is fairly and amply supported by the record.

Furthermore, Rolling appealed the trial court's ruling on his Fourth Amendment argument.   In Rolling I, the Supreme Court of Florida reviewed the trial court's determination of Rolling's motion to suppress physical evidence.  Applying the correct standards of federal law to the facts of the case, the supreme court reached the same conclusion as the trial court and affirmed the trial court's denial of Rolling's motion to suppress physical evidence.  See Rolling I, supra, 695 So. 2d at 292-94. As a result, this Court determines that Rolling was afforded every full and fair opportunity to litigate his Fourth Amendment claim.  Accordingly, no habeas relief is warranted on this ground.

D.  Ground Four:   Florida's Death Penalty Statute is Unconstitutional As Applied To Petitioner

In his final claim, Rolling contends that pursuant to the Supreme Court's ruling in Ring v. Arizona, 536 U. S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Florida death penalty statute, Fla. Stat. Section 921.141, is unconstitutional under the Sixth Amendment because the judge, not the jury, made the ultimate determination

---

[13]   In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

regarding whether the death penalty could be applied to him (i.e., that the aggravating factors in his case outweighed the mitigating factors).  He contends that there is no material difference between the Arizona death penalty statute at issue in <u>Ring</u>, <u>supra</u>, and Florida's statute.

As an initial matter, Rolling raised this issue for the first time by filing a notice of additional authority in his appeal from the denial of his post-conviction relief after all the pleadings had been filed.  The Supreme Court of Florida did not address the issue in its opinion.  It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[14] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, 513 U.S. at 365-66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); <u>Picard</u>, <u>supra</u>, 404 U.S. at 277-78.[15]

---

[14]   Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B) (i)  there is an absence of available State corrective process; or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

[15]   The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In <u>Picard v. Connor</u>, 404 U.S. 270, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971), the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," <u>id</u>. at 278, 92 S.Ct. at 513, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.
An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted,  such that federal review of the claim is not available. <u>O'Sullivan</u>

Regardless of the procedural default on this ground, Rolling's claim offers no basis for relief.  The Supreme Court has expressly held that <u>Ring</u> does not apply retroactively on collateral review.  <u>Schriro v. Summerlin</u>, 124 S. Ct. 2519, 2526 (2004).  Furthermore, Florida's capital sentencing procedures do not implicate  the Sixth Amendment concern identified in <u>Ring</u>, which was that Arizona's death penalty system, committed <u>both</u> capital sentencing factfinding and the ultimate sentencing decision entirely to the trial judge.  Florida, on the other hand, has a hybrid system in which the jury renders an advisory verdict, but the trial judge makes the ultimate sentencing determination.  <u>See</u> Fla. Stat. 921.141 (West 2005); <u>Ring</u>, <u>supra</u>, 536 U. S. at 608, n. 6, 122 S. Ct. at 2442.  A Florida defendant is eligible for the death penalty upon the conviction of first degree murder.  Because <u>Ring</u> holds that any fact which increases the penalty beyond the statutory maximum must be found by the jury, and because death is the statutory maximum for first degree murder in Florida, <u>Ring</u> does not establish Sixth Amendment error under Florida's statutory scheme.  <u>See</u> <u>also</u> <u>Hildwin v. Florida</u>, 490 U. S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728   (1989)  (per

v. Boerckel, 526 U.S. 838, 839-40, 848, 119 S. Ct. 1728, 1734, 144 L. Ed. 2d 1 (1999).  This Court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555, 115 L.. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); accord Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), rev'd on other grounds, 498 U.S. 308, 111 S. Ct. 731, 112 L.. Ed. 2d 812 (1991). However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424-25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

     To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice.  Tower, supra, 7 F.3d at 210; Parker, supra, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower v. Phillips, supra.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, supra, 513 U.S. at 327.  Further:

     a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

Id.  In his petition, Rolling has not addressed the issue of procedural default, nor argued that he meets the standards to overcome it.

<u>curium</u>) (finding no Sixth Amendment violation with Florida's death penalty scheme that permits judge to find aggravating circumstance authorizing death sentence).

In addition, Rolling's death sentence was supported by a recommendation of death by a unanimous jury.  Thus, any possible requirement that the jury find Rolling eligible for the death penalty was satisfied in this case.

### IV. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus (doc. 1) is DENIED.

DONE and ORDERED this 1st day of July, 2005.


s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**United States District Judge**